UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

HOOKS, ET AL.                              CIVIL ACTION

VERSUS                                     NO: 15-729

NATIONWIDE HOUSING                         SECTION: "J"(3)
SYSTEMS, LLC, ET AL.

## ORDER & REASONS

Before the Court is a *Motion in Limine* **(Rec. Doc. 59)** filed by Defendants, Nationwide Housing Systems, LLC ("Nationwide") and Oak Creek Homes, LLC ("Oak Creek"); an opposition thereto **(Rec. Doc. 66)** filed by Plaintiffs, Sarah Hooks' minor children and Michael Kronlage; a *Motion for Summary Judgment* **(Rec. Doc. 62)** filed by Defendants; an opposition thereto **(Rec. Doc. 68)** filed by Plaintiffs. Having considered the motion and legal memoranda, the record, and the applicable law, the Court finds that Defendants' *Motion for Summary Judgement* **(Rec. Doc. 62)** should be **GRANTED** for the reasons set forth more fully below.

## FACTS AND PROCEDURAL BACKGROUND

This litigation derives from injuries that Plaintiffs allegedly suffered when they were exposed to mold in their modular home. (Rec. Doc. 1-3.) In March 2010, Sarah Hooks and her then-husband, Brian Hooks, purchased from Nationwide a modular home, which Oak Creek manufactured. *Id.* at 5. Hooks and her two minor

children lived in the home from approximately April, 2010 until they moved in with Hooks' husband in the spring of 2013. *Id.* at 6. When Hooks and her children returned to the modular home in May 2014, Hooks "observed visible mold in the cabinets and on the wall area near the pantry of the home." *Id.* Hooks began to suspect that her and her children's medical symptoms, which she had previously attributed to allergies, resulted from exposure to the mold. *Id.* When Hooks informed her father, Michael Kronlage, about the mold, he similarly believed his medical symptoms resulted from mold exposure; Kronlage spent "extensive amounts of time in the home from April 2010 to May or June 2014" and also previously attributed his symptoms to allergies. *Id.*

After Hooks discovered the mold, she reported it to her homeowner's insurance carrier, which retained ProNet Group, LLC (ProNet), to "evaluate the origin and cause of the fungal growth." *Id.* ProNet concluded that mold resulted from a faulty A/C system and vapor barrier. *Id.* When Hooks reported the problem to Oak Creek, Oak Creek refused to repair or remediate the damage although reports from firms that Hooks and Oak Creek hired revealed elevated levels of mold in the home and recommended certain remediation efforts. *Id.* at 7-8.

On February 9, 2015, Plaintiffs filed suit against Nationwide and Oak Creek in the 21st Judicial District Court for the Parish of Tangipahoa, State of Louisiana. (Rec. Doc. 1, at 2.) In the complaint, Hooks alleges breach of warranty and products liability claims. (Rec. Doc. 1-3, at 8-10.) Additionally, Hooks, her minor children, and Kronlage allege claims for personal injuries suffered as a result of exposure to mold in the home. *Id.* at 11-12. Plaintiffs seek compensatory damages and legal interest thereon from the date of judicial demand until paid as well as "all general and equitable relief." *Id.* at 12.

Defendants removed the action to this Court on March 5, 2015. (Rec. Doc. 1.) On April 8, 2015, the Court granted Defendants' Motion to Compel Arbitration (Rec. Doc. 7) and stayed the claims of Sarah Hooks individually pending the outcome of arbitration. (Rec. Doc. 18.) However, the claims of Kronlage and Hooks on behalf of her minor children, CH and LH, remain pending before the Court. (Rec. Doc. 24.)

Defendants filed the instant *Motion in Limine* **(Rec. Doc. 59)** and *Motion for Summary Judgment* **(Rec. Doc. 62)** on May 31, 2016 and June 3, 2016, respectively. The motions before the Court pertain to Plaintiffs' personal injuries they allege resulted from exposure to mold inside the Plaintiffs' residence. Defendants seek to exclude all of Plaintiffs' expert witnesses, inlduing Glenn Ray, Steve Verret, Dr. Nabarun Ghosh, Dr. Jeffrey LaCour, Dr.

3

Anthony Zerangue, and Dr. Sweta Shah from testifying concerning general causation, specific causation, or any health effects from exposure to mold or fungi. (Rec. Doc. 59-1, at 1.) Further, Defendants argue that if such experts are not permitted to testify then Defendants are entitled to judgment as a matter of law.

I.   **Defendant's *Motion in Limine* (Rec. Doc. 59) to Exclude Dr. LaCour, Dr. Shah, and Dr. Zerangue under Federal Rule of Civil Procedure 26 and 37**

   a.   **Parties' Arguments**

Dr. Jeffrey LaCour is an Ear, Nose, and Throat physician who treated Plaintiffs during the alleged mold-exposure period. (Rec. Doc. 66, at 4). Dr. Anthony Zarengue, according to Plaintiffs, treated Ms. Hooks and Mr. Kronlage during "the time periods when they reported increased or severe ENT/respiratory symptoms." *Id.* Finally, Dr. Sweta Shah is an allergist who, according to Plaintiffs, treated Ms. Hooks, Ms. Hook's minor child C.H., and Mr. Kronlage. According to Plaintiffs, Dr. Shah is a colleague of Dr. David Schneider, another of the Plaintiffs' expert witnesses. *Id.* at 5.

Defendants argue that Plaintiffs have not produced reports under Federal Rule of Civil Procedure 26(a)(2)(B) or 26(a)(2)(C) for these three experts. (Rec. Doc. 59-1, at 18.) Defendants allege that Plaintiffs did not identify Dr. Zerangue or Dr. Shah as expert

4

witnesses when they disclosed their experts in this case. *Id.* at 22. Further, Defendants argue that because Plaintiffs have failed to produce an expert report or a summary of the facts and opinions to which the witness is expected to testify for Dr. LaCour, Dr. Zarengues, and Dr. Shaw more than 90 days prior to trial, these treating physicians should be excluded from testifying at any hearing or trial. *Id.* at 23.

In opposition, Plaintiffs assert that Dr. Jeffrey LaCour is a designated expert witness who has submitted his expert opinions in this case. Further, as the Plaintiffs' argue that Dr. LaCour's report is in compliance with Federal Rule of Civil Procedure 26(a)(2)(B). (Rec. Doc. 66, at 4.) Plaintiffs next argue that Dr. Zerangue was identified as a witness to Defendants in Plaintiffs' witness list produced in accordance within this Court's scheduling order. *Id.* at 5. Plaintiffs expect Dr. Zerangue to testify about the medical treatment he provided to Ms. Hooks and Mr. Kronlage during the time period when they allegedly reported increased or severe ENT/respiratory symptoms, the nature of the symptoms, the diagnoses identified, the nature of the treatment provided, and the diagnostic tests performed. *Id.*

Finally, Plaintiffs assert that Dr. Sweta Shah was identified as a witness who may be called to testify about the medical treatment she rendered to Ms. Hooks, Ms. Hooks minor child C.H., and Mr. Kronlage. *Id.* Plaintiffs argue that Dr. Shah was identified

to Defendants in accordance within this Court's scheduling order. Plaintiffs anticipate Dr. Shah to testify about the medical treatment she rendered, the Plaintiffs' symptoms and diagnoses, and diagnostic tests performed. As Plaintiffs' treating physicians, Plaintiff assert that Dr. Shah and Dr. Zerangue are not required to produce expert reports in order to testify about their treatment, diagnoses, and observations. *Id.*

### b.   Rule 26 of the Federal Rules of Civil Procedure

Rule 26 of the Federal Rules of Civil Procedure require a party "disclose to the other parties the identity of any witness it may use at trial to present evidence under Federal Rule of Evidence 702, 703, or 705." Fed. R. Civ. P. 26(a)(2)(A). Rule 26 categorizes these witnesses for purposes of disclosure requirements into those expert witnesses who are retained or specially employed to give expert testimony and those who are not retained or specially employed but may provide expert testimony. See Fed. R. Civ. P. 26(a)(2)(A),(C); Advisory Comm. Note 2010.

Experts retained by the party must provide an expert report pursuant to Rule 26(a)(2)(B). As to non-retained expert witnesses, prior to 2010 those witnesses (e.g., treating physicians) were exempt from disclosure requirements under Rule 26(a)(2)(B), but under the "treating physician exception" were allowed to testify as to those facts related to the medical records and treatment.

*See Perdomo v. United States*, 2012 WL 2138106 at *1 (E.D. La. 2012); *Morgan v. Chet Morrison Contractors, Inc.*, 2008 WL 7602163 at *1 (E.D. La. 2008). A number of courts determined that a treating physician may offer testimony as a non-retained expert if the testimony is confined to those facts or data the physician learned during actual treatment of the plaintiff. *Morgan*, 2008 WL 7602163 at * 2; *Perdomo*, 2012 WL 2138106 at *4; *LaShip, LLC, v. Hayward Baker, Inc.*, 296 F.R.D. 475, 480 (E.D. La. 2013); *Kim v. Time Ins. Co.*, 267 F.R.D. 499, 502 (S.D. Tex. 2008). On the other hand, where testimony "consists of opinions based on 'scientific, technical, or other specialized knowledge' regardless of whether those opinions were formed during the scope of interaction with a party prior to litigation," the testimony is rather that of an expert. *Musser v. Gentiva Health Servs.*, 356 F.3d 751, 757, n. 2 (7th Cir. 2004) (citation omitted). For example, testimony as to causation or as to future medical treatment has been considered the province of expert testimony subject to the requirements of section (a)(2)(B). *Rea v. Wis. Coach Lines, Inc.*, No. 12-1252, 2014 WL 4981803, at * 2 (E.D. La. Oct. 3, 2014) (citations omitted). In addition, where physicians' testimony is prepared in anticipation of litigation by the attorney or relies on sources other than those utilized in treatment, courts have found that the treating physician acts more like an expert and must submit a report under Rule 26(a)(2)(B). *See e.g., Robert Parker, et al. v.*

*NGM Insur. Co., et al.*, No. 15-2123, 2016 WL 3198613, at *2 (E.D. La. June 9, 2016).

Since Congress amended Rule 26 in 2010, however, Rule 26(a)(2)(C) creates a separate requirement that expert witnesses who do not provide a written report, such as treating physicians, must submit a disclosure stating: (i) the subject matter on which the witness is expected to testify under Federal Rules of Evidence 702, 703, and 704; and (ii) the facts and opinions to which the witness is expected to testify. The 2010 Advisory Committee Notes specifically address treating physicians, and have lead courts to the conclusion that any testimony not contained in medical records is more aptly considered expert testimony and subject to disclosure under Rule 26(a)(2)(C). *See Perdomo*, 2012 WL 2138106 at *1; *Boudreaux*, 2013 WL 3440027, at *3.

Failure to comply with the deadline for disclosure requirements results in "mandatory and automatic" exclusion under Federal Rule of Civil Procedure 37(c)(1), and the party is not allowed to use "that information or witness to supply evidence on a motion, at a hearing, or at trial, unless the failure was substantially justified or is harmless." *Red Dot Bldgs. v. Jacob Tech., Inc.*, 2012 WL 2061904, at *3 (E.D. La. 2012); *see also Lampe Berger USA, Inc. v. Scentier, Inc.*, 2008 WL 3386716, at *2 (M.D. La. 2008). Courts evaluate four factors to assess the nature of the omission in deciding whether to strike the testimony: (1) the

explanation for the failure to identify the witness; (2) the importance of the testimony; (3) potential prejudice in allowing the testimony; and (4) the availability of a continuance to cure such prejudice. *Betzel v. State Farm Lloyds*, 480 F.3d 704, 707 (5th Cir. 2007).

### c.  Discussion

The Court will first address Defendants' argument that Plaintiffs' experts Dr. Shah and Dr. Zerangue have failed to produce an expert report under Rule 26(a)(2)(B) or Rule 26(a)(2)(C). Plaintiffs allege that Dr. Shah and Dr. Zerangue are treating physicians and thus not subject to produce an expert report in order to testify about their treatment of Plaintiffs. (Rec. Doc. 66, at 5.) Plaintiffs cite to *Rea v. Wisconsin Coach Lines, Inc.*, in support of this proposition. *Id.* While true that, prior to 2010, treating physicians were exempt from the disclosure requirements under Rule 26(a)(2)(B), after Congress amended Rule 26 in 2010, treating physicians are now subject to disclosure requirements under Rule 26(a)(2)(C). *Rea*, 2014 WL 4981803, at *2-3. Today, under Rule 26(a)(2)(C) treating physicians must submit a disclosure stating: (i) the subject matter on which the witness is expected to testify under Federal Rules of Evidence 702, 703, and 704; and (ii) the facts and opinions to which the witness is

expected to testify. *Rea*, 2014 WL 4981803, at *5; *Robert Parker*, 2016 WL 3198613, at *2.

Defendants allege that Plaintiffs have not produce expert reports or a summary of facts and opinions from Dr. Zerangue or Dr. Shah. (Rec. Doc. 59-1, at 23.) As to these witnesses, Plaintiffs only argue that such reports are unnecessary because these doctors are "treating physicians."[1] (Rec. Doc. 66, at 5.) A review of the record shows that no expert report or factual summary was produced by Plaintiff in regards to Dr. Zerangue or Dr. Shah. Plaintiffs were required to produce its Rule 26(a)(2)(B) reports by no later than May 6, 2016. (Rec. Doc. 48.) Plaintiffs were required to produce Rule 26(a)(2)(C) reports by no later than 90 days prior to trial. Fed. R. Civ. P. 26(a)(2)(D)(i).

Under Federal Rule of Civil Procedure 37(c)(1) a failure to comply with the deadline for disclosure requirements results in "mandatory and automatic" exclusion. Fed. R. Civ. P. 37(c)(1). Further, the party failing to disclose may not use "that information or witness to supply evidence on a motion, at a hearing, or at trial, unless the failure was substantially justified or is harmless." *Red Dot Bldgs*., 2012 WL 2061904, at *3; *see also Lampe Berger*, 2008 WL 3386716, at *2. Plaintiffs' counsel asserts that Dr. Shah and Dr. Zerangue are not designated as

---

[1] In further support of their argument, Plaintiff cites to *Kim*, 267 F.R.D. 499. Importantly, this case was decided prior to Congress's 2010 amendment of Rule 26.

experts, but should be permitted to testify as treating physicians. (Rec. Doc. 66, at 15.) As outlined above, treating physicians are required to produce a disclosure in accordance with Rule 26(a)(2)(C).

Where an expert fails to comply with Rule 26's disclosure requirements, the court must exercise its discretion in deciding whether or not to exclude such testimony. *Edna Tajonera, v. Black Elk Energy Offshore Operations, LLC*, No. 13-0366, 2016 WL 3180776, at *10 (E.D. La. June 7, 2016). In evaluating whether to exclude expert testimony, the Fifth Circuit instructs courts to consider four factors: (1) the explanation of the party for its failure to identify the witness, (2) the importance of the excluded testimony, (3) the potential prejudice that would arise from allowing the testimony, and (4) the availability of a continuance to cure such prejudice. *Tajonera*, 2016 WL 3180776, at *10 (citing *Betzel v. State Farm Lloyds*, 480 F.3d 704, 707 (5th Cir. 2007)). Here, like *Tajonera*, neither party framed its arguments regarding Dr. Shah and Dr. Zerangue's testimony according to this four-factor test. In *Tajonera*, the Court permitted an expert's testimony despite counsel failing to provide an expert report under Rule 26. *Tajonera*, 2016 WL 3180776, at *10. The Court determined that no prejudice would arise from allowing the testimony as the expert had been deposed nearly two years prior to the start of trial, the party offering the expert's testimony planned to only submit the

expert's deposition, and the opposing party had notice for two years of "every word of [the expert's] testimony." *Id.* However, here, unlike *Tajonera*, Plaintiffs have provided no information as to what Dr. Zerangue and Dr. Shah intend to testify other than "about facts, data, and symptoms they observed in their patients during treatment." (Rec. Doc. 66, at 15). Therefore, the Court finds that Plaintiffs are prohibited from using information from either Dr. Zerangue or Dr. Shah "to supply evidence on a motion, at a hearing, or at trial." *Red Dot Bldgs.*, 2012 WL 2061904, at *3; *see also Lampe Berger*, 2008 WL 3386716, at *2.

Defendants further argue that Dr. LaCour has failed to produce an expert report or a summary of facts and opinions as required by Rule 26. Defendants appear to argue that Dr. LaCour's report does not satisfy Rule 26(a)(2)(B)-(C)'s requirements, rather than allege that no report was filed. Specifically, Defendants argue that, generally, treating physicians are exempt from the requirement of producing an expert report under Rule 26(a)(2)(B) when their testimony is confined to those facts or data the physician learned during the actual treatment of the plaintiff. (Rec. Doc. 59-1, at 22.) However, Defendants argue that if Dr. LaCour intends to testify as to causation or as to future medical treatment then Dr. LaCour was required to submit a report under Rule 26(a)(2)(B). (Rec. Doc. 59-1, at 18.) Plaintiffs' memoranda provides that "Dr. LaCour, as a <u>medical doctor</u>, and not a trained

12

toxicologist, does not render a "causation" opinion, because such
an opinion is not relevant to his diagnosis or treatment." (Rec.
Doc. 66, at 14) (emphasis in original). Thus, at this juncture,
the Court will assume that Dr. LaCour is a *bona fide* treating
physician.[2] Dr. LaCour's report does not satisfy the requirements
of Rule 26(a)(2)(B). Specifically, the report does not provide "a
*complete statement* of all opinions the expert will express and *the*
*basis and reasons* for them" nor a list of all other cases Dr.
LaCour has testified as an expert at trial or by deposition. (Rec.
Doc. 66-3.) Therefore, Dr. LaCour's Physician's Opinion Report
does not qualify as a Rule 26(a)(2)(B) report. *Audubon Veterinary*
*Hosp. v. U.S. Fidelity & Guar. Co.*, No. 06-5875, 2007 WL 1853369
(E.D. La. June 25, 2007).

Thus, the Court's remaining inquiry is whether Dr. LaCour's
report satisfies Rule 26(a)(2)(C)'s disclosure requirement. This
Court has explained that "courts 'must take care against requiring
undue detail' in Rule 26(a)(2)(C) disclosures." *Anders v. Hercules*
*Offshore Servs.*, LLC, 311 F.R.D. 161, 164 (E.D. La. 2015) (quoting
*Rea*, 2014 WL 4981803, at *5). Further, the Fifth Circuit has
acknowledged that "[t]he basic purpose of Rule 26 is to prevent
prejudice and surprise." *Anders*, 311 F.R.D. at 164 (citing *Joe*

---

[2] *Cf. Perdomo*, 2012 WL 2138106, at *1 (Noting that treating physicians summary
disclosure requirement under 26(a)(2)(C) pertains solely to the opinions not
contained in medical records. However, the Court refused to allow the treating
physicians to testify outside the scope of their medical records).

*Hand Prods., Inc. v. Chios, Inc.*, 544 F. App'x 444, 446 (5th Cir. 2013). However, disclosures consisting of medical records alone are insufficient to satisfy the disclosure standard of Rule 26(a)(2)(C). *Williams v. State*, No. 14-00154, 2015 WL 5438596, at *4 (M.D. La. Sept. 14, 2015). The Court finds that Dr. LaCour's report (Rec. Doc. 66-3) satisfies the liberal standard set forth in Rule 26(a)(2)(C). Moreover, Dr. LaCour and his report were disclosed more than 90 days prior to trial and therefore are timely under Rule 26(a)(2)(D).[3]

## II.     **Defendants' Motion to Exclude Plaintiffs' Experts under** *Daubert*

### a.   *Daubert* **Standard**

Federal Rule of Evidence 702 provides that a witness who is qualified as an expert may testify if: (1) the expert's "specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue"; (2) the expert's testimony "is based on sufficient facts or data"; (3) the expert's testimony "is the product of reliable principles and methods"; and (4) the principles and methods employed by the expert have been

---

[3] The Scheduling Order only dictates the date by which Rule 26(a)(2)(B) expert reports must be submitted. (Rec. Doc. 49.) Therefore, the default rule under Rule 26(a)(2)(D) applies to Rule(a)(2)(C) experts. Dr. LaCour's Physician Opinion Report was provided by Plaintiff on December 8, 2015 as an exhibit to Plaintiff's Memorandum in Opposition to Defendants' Motion for Summary Judgment. (Rec. Doc. 42.)

reliably applied to the facts of the case. Fed. R. Evid. 702. The United States Supreme Court's decision in *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993), provides the analytical framework for determining whether expert testimony is admissible under Rule 702. Both scientific and nonscientific expert testimony are subject to the *Daubert* framework, which requires trial courts to make a preliminary assessment of "whether the expert testimony is both reliable and relevant." *Burleson v. Tex. Dep't of Criminal Justice*, 393 F.3d 577, 584 (5th Cir. 2004); *see also Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999). When expert testimony is challenged under *Daubert*, the party offering the expert's testimony bears the burden of proving its reliability and relevance by a preponderance of the evidence. *Moore v. Ashland Chem. Co.*, 151 F.3d 269, 276 (5th Cir. 1998).

The reliability of expert testimony "is determined by assessing whether the reasoning or methodology underlying the testimony is scientifically valid." *Knight v. Kirby Inland Marine Inc.*, 482 F.3d 347, 352 (5th Cir. 2007). A number of nonexclusive factors may be relevant to the reliability analysis, including: (1) whether the technique at issue has been tested; (2) whether the technique has been subjected to peer review and publication; (3) the potential error rate; (4) the existence and maintenance of standards controlling the technique's operation; and (5) whether the technique is generally accepted in the relevant scientific

community. *Burleson*, 393 F.3d at 584. The reliability inquiry must remain flexible, however, as "not every *Daubert* factor will be applicable in every situation; and a court has discretion to consider other factors it deems relevant." *Guy v. Crown Equip. Corp.*, 394 F.3d 320, 325 (5th Cir. 2004); *see also Runnels v. Tex. Children's Hosp. Select Plan*, 167 F. App'x 377, 381 (5th Cir. 2006) ("[A] trial judge has considerable leeway in determining how to test an expert's reliability.").

With respect to the relevancy prong, the proposed expert testimony must be relevant "not simply in the way all testimony must be relevant [pursuant to Rule 402], but also in the sense that the expert's proposed opinion would assist the trier of fact to understand or determine a fact in issue." *Bocanegra v. Vicmar Servs., Inc.*, 320 F.3d 581, 584 (5th Cir. 2003). Ultimately, a court should not allow its "gatekeeper" role to supersede the traditional adversary system, or the jury's place within that system. *Scordill v. Louisville Ladder Grp., LLC*, No. 02-2565, 2003 WL 22427981 at *3 (E.D. La. Oct. 24, 2003). As the Supreme Court noted, "vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596. Generally, questions relating to the basis and sources of an expert's opinion rather than its admissibility should be left for the jury's

consideration. *United States v. 14.38 Acres of Land*, 80 F.3d 1074, 1077 (5th Cir. 1996) (citing *Viterbo v. Dow Chemical Co.*, 826 F.2d 420, 422 (5th Cir. 1987)).

### b.   Glenn Ray

In their motion in limine, Defendants seek to have the Court exclude and prohibit the introduction of any opinion by Plaintiffs' expert Glenn Ray of RTC of Louisiana, LLC, concerning health effects related to or arising from exposure to mold or fungi. (Rec. Doc. 59-1, at 4.) Defendants first contend that Ray lacks the qualifications to express such opinions. *Id.* Next, Defendants argue that Ray has failed to support his opinions with credible scientific information or data.  *Id.* at 5. Further, Defendants argue that Ray has failed to provide any information about the methodology he employed to arrive at his conclusions. *Id.*

In their opposition, Plaintiffs contend that Ray should be permitted to testify about potential health effects of mold and fungi. (Rec. Doc. 66, at 3.) Plaintiffs claim that Ray's testimony does not consist of medical diagnoses, but rather includes potential health effects of mold found at elevated levels within the Hooks's residence. *Id.* at 12. According to Plaintiffs, knowledge and understanding of potential health effects of mold are fundamental to Ray's professional duties. *Id.* at 13. Further,

Plaintiffs argue that Ray's findings are substantiated and supported by industry resources and professional manuals. *Id.*

The Court must first determine whether Ray is qualified to offer expert testimony on the issue of causation in this case. To qualify as an expert, "the witness must have such knowledge or experience in [his] field or calling as to make it appear that his opinion or inference will probably aid the trier in his search for truth." *United States v. Hicks*, 389 F.3d 514, 524 (5th Cir. 2004) (quoting *United States v. Bourgeois*, 950 F.2d 980, 987 (5th Cir. 1992)). Additionally, Rule 702 states that an expert may be qualified based on "knowledge, skill, experience, training, or education." *Hicks*, 389 F.3d at 524; *see also Kumho Tire Co.*, 526 U.S. at 147 (discussing witnesses whose expertise is based purely on experience). "A district court should refuse to allow an expert witness to testify if it finds that the witness is not qualified to testify in a particular field or on a given subject." *Huss v. Gayden*, 571 F.3d 442, 452 (5th Cir. 2009) (quoting *Wilson v. Woods*, 163 F.3d 935, 937 (5th Cir. 1999)). However, "Rule 702 does not mandate that an expert be highly qualified in order to testify about a given issue. Differences in expertise bear chiefly on the weight to be assigned to the testimony by the trier of fact, not its admissibility." *Id.* (citing *Daubert*, 509 U.S. at 596).

"A lack of specialization should generally go to the weight of the evidence, rather than its admissibility." *United States v. Wen Chyu Liu*, 716 F.3d 159, 168 (5th Cir. 2013). "[V]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Id.* (quoting *Daubert*, 509 U.S. at 596). "Thus 'an expert witness is not strictly confined to his area of practice, but may testify concerning related applications; a lack of specialization does not affect the admissibility of the opinion, but only its weight.'" *Id.* (quoting *Wheeler v. John Deere Co.*, 935 F.2d 1090, 1100 (10th Cir. 1991)).

Glenn Ray is a specialist in cleaning and restoration, and certified in mold remediation. (Rec. Doc. 62-7.) Ray graduated from Southeastern Louisiana University with a degree in Marketing. *Id.* Since 2000, Ray has served as the president of RTC of Louisiana, LLC. *Id.* In this role, he provides water damage restoration and mold investigations for residential and commercial properties. *Id.* In addition, he has instructed courses in water damage, health and safety, and mold remediation. *Id.* Ray also serves as an educator for the Louisiana State University Agriculture Center, where he instructs a course in mold and safe work practices. *Id.* Ray has been a Certified Indoor

Environmentalist since 2002 and a Certified Mold Remediator since 2001. *Id.* at 5.

In connection with this lawsuit, Ray evaluated the condition of the Hooks' residence, prepared a remediation plan, and authored a report. In his report, Ray explains that he detected elevated levels of "Aspergillus/Penicillium like fungi" inside the home. Defendants take issue with the following portion of Ray's report, regarding the general health risks of exposure to Aspergillus and Penicillium:

> Aspergillus and Penicillium are two fungi that produce small round spores that are difficult to distinguish without culturing them. Aspergillus and Penicillium are both listed as water indicating fungi in that they grow well indoors after water damage. Both fungi also will germinate with only damp conditions, such as a relative humidity on the surface of 70% for 48 hours. Both of these fungi are know [sic] to produce mycotoxins and are listed an [sic] allergens. For persons with a weakened immune system Aspergillus can present some serious health risk.

(Rec. Doc. 59-1, at 4.) Defendants argue that Ray fails to provide information concerning how he is qualified to state that Aspergillus or Penicillium produce mycotoxins that are allergens to humans or how Aspergillus can present serious health risks to persons with weakened immune systems.

Ray is not a medical doctor or a toxicologist, nor has he received any training in toxicology. The fact that Ray is not a toxicologist or a medical doctor does not disqualify him as an

20

expert in this case, *see Genty v. Resolution Tr. Corp.*, 937 F.2d 899, 917 (3d Cir. 1991) ("Medical doctors . . . are not the only experts qualified to render an opinion as to the harm caused by exposure to toxic chemicals."), but it is problematic. As several courts have recognized, the notion that indoor mold growth can lead to significant toxicity in occupants of moldy buildings has been very controversial in the scientific literature. *See, e.g., Young v. Burton*, 567 F. Supp. 2d 121, 139 (D.D.C. 2008) (discussing the absence of a consensus in the medical community about the health effects of exposure to mold); *Jenkins v. Slidella, LLC*, No. 05-370, 2008 WL 2649510, at *6 (E.D. La. June 27, 2008) (finding that there are no medical or scientific authorities that establish a general causal relationship between exposure to mold and injurious consequences to human health).

Even assuming Ray is qualified to provide expert opinion regarding the potential health effects associated with exposure to Aspergillus and Penicillium, his opinions are insufficient to establish general causation in this case. "General causation is whether a substance is capable of causing a particular injury or condition in the general population." *Id.* In a toxic mold case, a plaintiff must establish that a level of exposure to the type of mold in question can cause adverse health effects in general. *See Watters v. Dep't of Soc. Servs.*, No. 2008-0977, (La. App. 4 Cir. 6/17/09); 15 So. 3d 1128, 1142-43 ("General causation refers to

21

proving exposure in a dose sufficient to cause health effects—that exposure to mold can cause disease."). Thus, in order for Plaintiffs to establish general causation, they bear the burden of proving, by a preponderance of evidence, that they were exposed to a level of mold sufficient to cause health effects.

Ray states in his report that there are no standards or permissible exposure limits for mold spores. He explains that the industry custom is to compare the levels of fungi spores found indoors and outdoors. Accordingly, Ray asserts that Aspergillus/Penicillium like fungi is elevated inside the Hooks's home. While this may be true, nothing in Ray's report supports a finding that the Plaintiffs were exposed to a dose of Aspergillus/Penicillium like fungi sufficient to cause health effects, as required to prove general causation. *See Watters*, 15 So. 3d at 1142-43.

It is undisputed that Plaintiffs were not living in the home at the time of either expert's testing. Ray does not form an opinion as to the levels of Aspergillus and Penicillium inside the house while Plaintiffs lived there, nor does he provide a reliable methodology for forming such an opinion. For this reason, the experts' samples provide nothing more than the levels of molds found in the home—they do not provide any findings or conclusions as to the severity of the Plaintiffs' exposure to any specific type of mold. Even assuming that exposure to Aspergillus and

Penicillium at a levels higher indoors than outdoors would be harmful, Plaintiffs fail to provide any evidence that they were actually exposed to harmful levels of Aspergillus and Penicillium, or any other type of mold. *See Pratt v. Landings at Barksdale*, No. 09-1734, 2013 WL 5376021, at *4 (W.D. La. Sept. 24, 2013) ("It is essential that Plaintiffs demonstrate that they were, in fact, exposed to harmful levels of mold.").

### c.   Dr. Nabarun Ghosh

Dr. Nabarun Ghosh is a professor and research scientist at West Texas A&M University "with specialized expertise, education, and experience in toxicology, mycology, and mycopathology." (Rec. Doc. 66, at 2.) Dr. Goush has earned a Ph.D. in Biology and Cytogenetics and has thirty years of research experience. *Id.* Dr. Ghoush reviewed and analyzed Plaintiffs' medical records, affidavits, and evidence of alleged mold exposure. *Id.* at 3. Defendants raise several arguments as to Dr. Ghoush's inability to testify in this case. First, Defendants argue that because Dr. Ghosh is not licensed to practice medicine, and therefore prohibited from rendering a diagnosis of any injury, illness, or disease, then Dr. Ghosh lacks the expertise to testify on causation. (Rec. Doc. 59-1, at 11.) Defendants further attack the methodology used by Dr. Ghosh to develop his opinions in this case. *Id.* at 12. Finally, Defendants argue that many of the sources Dr.

23

Ghosh used to reach his conclusions are unreliable. *Id.* at 16-18. In sum, Defendants argue that Dr. Ghoush is not qualified to offer expert testimony on general causation, specific causation, or the health effects associated with mold exposure. And Defendants challenge the methodology used by Dr. Ghosh as to general causation, specific causation, and the effects associated with mold exposure.

Plaintiffs argue that Dr. Ghosh's anticipated testimony is reliable and that his methodology is approved. Plaintiffs assert that Dr. Ghosh received and reviewed medical records and reports from Dr. Schneider, Dr. LaCour, and Dr. Leumas along with all available evidence of mold at the residence, including reports by Bobby Parks, Glenn Ray, and Steve Verret. Plaintiffs point to the several sources, which "cite to hundreds more", which Plaintiffs claim validate Dr. Ghosh's testimony that there is a causal relationship of damp indoor environments and negative health outcomes. (Rec. Doc. 66, at 8.) Specifically, Plaintiffs assert that Dr. Ghosh relied on reports from the Center for Disease Control, the United States Department of Health, Federal Occupational Health Division, two "quantitative peer-reviewed research papers", and the World Health Organization to reach his conclusion that, more likely than not, mold caused the Plaintiffs' symptoms. *Id.* at 7-11.

Even assuming Dr. Ghosh is qualified to provide expert opinion regarding the potential health effects associated with exposure to Aspergillus and Penicillium, the Court must still determine whether Dr. Ghosh's proposed testimony is reliable. Plaintiffs bear the burden of proving by a preponderance of evidence that Dr. Ghosh's intended testimony is reliable. *Moore*, 151 F.3d at 276. To determine whether Dr. Ghosh's testimony is reliable, the Court must assess whether the reasoning or methodology underlying his testimony is scientifically valid. Federal Rule of Evidence 703 provides that:

> An expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed. If experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted. But if the facts or data would otherwise be inadmissible, the proponent of the opinion may disclose them to the jury only if their probative value in helping the jury evaluate the opinion substantially outweighs their prejudicial effect.

The Court may look to a number of non-exhaustive factors, including: (1) whether the technique at issue has been tested; (2) whether the technique has been subjected to peer review and publication; (3) the potential error rate; (4) the existence and maintenance of standards controlling the technique's operation; and (5) whether the technique is generally accepted in the relevant scientific community. *Burleson*, 393 F.3d at 584. The reliability inquiry must remain flexible, however, as "not every *Daubert* factor

will be applicable in every situation; and a court has discretion to consider other factors it deems relevant." *Guy*, 394 F.3d at 325; *see also Runnels*, 167 F. App'x at 381 ("[A] trial judge has considerable leeway in determining how to test an expert's reliability."). However, where an expert's opinion is based on insufficient information, the analysis is unreliable. *Paz*, 555 F.3d at 388.

Dr. Ghosh described the methodology he employed in reaching his conclusion that the mold in the Hooks' residence was causally related to the Plaintiffs injuries in his report. He provides:

> I examined the mold sampling reports from the investigators Glenn Ray and Bobby Parks. I have examined and checked on references in the scientific literature to justify the facts stated in all the documents and the medical reports prepared by Dr. LaCour . . . Dr. Leumas . . . and Dr. Schneider. I also examined the investigation by Dr. Smith, defendants' medical expert. I am submitting my findings and providing my expert opinion below based on the documents submitted to me, and my independent research and expertise.

Rec. Doc. 66-1.) Dr. Ghosh's report relies on Glenn Ray's report which provided that the Hooks' living room presented an Aspergillus/Penicillium spore count of 10,900 count/m³. *Id.* at 2. Further, Glenn Ray's report showed an Aspergillus/Penicillium spore count of 16,200 count/m³ was present in the Hooks' kitchen. *Id.* Dr. Ghosh then compared these numbers to the outside spore count of 300 count/m³ and concluded that "[a]ll these counts are much higher than the 'Acceptable Level' of the Airborne Mold Spore

26

Count Number Guide. *Id.* Even assuming that Dr. Ghosh's reliance on the "Airborne Mold Spore Count Number Guide" is proper methodology, Dr. Ghosh has not provided the mold level at which the Plaintiffs were exposed which supposedly caused their illnesses.

Dr. Ghosh relies heavily on Dr. Chris Leumas statement that "the daily excessive exposure to the toxins from the propagating molds in that building could produce" the symptoms suffered by Plaintiffs. *Id.* at 3. However, Dr. Leumas' report does not state that the Plaintiffs were exposed to daily excessive exposure. Dr. Leaumas' report speculates that "if their home provided the environment required for the excessive propagation of molds where these children lived" this could have caused Plaintiffs to become ill, especially if their symptoms diminished after the Plaintiffs moved out of the home. (Rec. Doc. 62-11, at 1.) Thus, neither Dr. Leumas nor Dr. Ghosh have any evidence of the exposure levels the Hooks were exposed to during the time living in the home. Further, neither Dr. Ghosh, nor any expert upon which Dr. Ghosh relied, attempted to extrapolate the mold level two months after the Hooks left their home to the potential levels they may have been exposed.[4] In short, Dr. Ghosh relied on a hypothetical statement that the Plaintiffs were exposed to daily excessive exposure, which again

---

[4] The Court makes no determination as to whether an extrapolation method would satisfy the *Daubert* standard. The Court merely mentions this to show that Plaintiffs have not even attempted to show the mold level at which the Plaintiffs may have been exposed.

is speculation and not the type of information an expert may reliably use to reach an opinion as to causation.

Dr. Ghosh further relied on Dr. LaCour's expert report to reach his ultimate conclusion. Dr. Ghosh's report provides that "[b]ased on Dr. LaCour's records and report and the documented presence of mold in the home, the respiratory and sinus symptoms and injuries documented by Dr. LaCourt for [C.H.], [L.H.], Sarah Hooks, and Michael Kronlage are more likely than not caused by or exacerbated by exposure to mold in their home." (Rec. Doc. 66-1, at 4.) However, Dr. LaCour's report shows that only Michael Kronlage's symptoms may have been caused by Aspergillus. (Rec. Doc. 62-19, at 7.) Dr. LaCour's diagnosis for L.H. and C.H. does not mention mold as a possible cause of their diagnoses. *Id.* at 5-13. Again, Dr. Ghosh's opinion is unsupported by the medical evidence provided by Dr. LaCour whose reports indicated that only Mr. Kronlage's symptoms may have occurred due to exposure to Aspergillus, and that neither minor child's diagnosis was related to mold.

Also, Dr. Ghosh admits is that he is not a medical doctor, is not licensed to practice medicine, and agrees that he is prohibited from rending a diagnosis of any injury, illness or disease in human beings. (Rec. Doc. 62-16, at 4.) However, Dr. Ghosh concludes his report by providing that, in his opinion, the Hooks family members suffered from medical symptoms and conditions caused by the moldy

28

environment in their home. (Rec. Doc. 66-1, at 5.) Thus, while admitting that he cannot render a diagnosis of any injury or illness, Dr. Ghosh has concluded that Plaintiffs suffered "medical symptoms" caused by mold. In all, Dr. Ghosh relies heavily on the alleged temporal connection between the presence of mold in the Hooks' home, their illnesses while living in the home, and their improvement upon moving to a different home. *Id.*

Last, although recognizing that, generally, questions relating to the bases and sources of an expert's opinion affect the weight of the evidence rather than its admissibility, this presumes that the bases and sources are not wholly unreliable. *Kandise Snider v. N.H. Ins. Co.*, No. 14-2132, 2016 WL 3193473, at *2 (E.D. La. June 9, 2016). Dr. Ghoush provides "support" for his expert report by citing to "scientific literature". (Rec. Doc. 66-1, at 5.) However, some of the sources cited seem to carry little to no weight in supporting Dr. Ghoush's expert opinion. *Id.*

Dr. Ghosh is not a medical doctor or a toxicologist. Once again, the fact that Dr. Ghosh is not a toxicologist or a medical doctor does not automatically disqualify him as an expert in this case, *see Genty*, 937 F.2d at 917, but it is problematic. As several courts have recognized, the notion that indoor mold growth can lead to significant toxicity in occupants of moldy buildings has been very controversial in the scientific literature. *See, e.g., Young*, 567 F. Supp. 2d at 139; *Jenkins*, 2008 WL 2649510, at *6.

29

In all, Dr. Ghosh's proposed testimony possesses the same flaws as Mr. Ray in regard to general causation. Dr. Ghosh relies heavily on Glenn Ray's report to determine the levels of Aspergillus and Penicillium. However, like Mr. Ray, Dr. Ghosh does not form an opinion as to the levels of Aspergillus and Penicillium inside the house while Plaintiffs lived there, nor does he provide a reliable methodology for forming such an opinion. For this reason, Dr. Ghosh's opinion merely reiterates the levels of molds found in the home—he does not provide any findings or conclusions as to the severity of the Plaintiffs' exposure to any specific type of mold. Even assuming that exposure to Aspergillus and Penicillium at a levels higher indoors than outdoors would be harmful, Dr. Ghosh fails to provide any evidence that they were *actually exposed* to harmful levels of Aspergillus and Penicillium, or any other type of mold. *See Pratt v. Landings at Barksdale*, No. 09-1734, 2013 WL 5376021, at *4 (W.D. La. Sept. 24, 2013) ("It is essential that Plaintiffs demonstrate that they were, in fact, exposed to harmful levels of mold."). Therefore, the Court finds that Dr. Ghosh may not testify to general causation in this case.

Further, Dr. Ghosh is equally unable to provide testimony as to specific causation. "[S]pecific causation is whether a substance caused a particular individual's injury." *Knight*, 482 F.3d at 351. "Evidence concerning specific causation in toxic tort cases is admissible only as a follow-up to admissible general

causation evidence." *Id.* In a toxic mold case, a plaintiff must prove, given that the mold in question is capable of causing harm of the type suffered, that the specific type of mold found more likely than not caused the plaintiff's injuries in this particular case. *See Watters*, 15 So. 3d at 1143, n.18 ("Specific causation refers to proving a sufficient causative link between the alleged health problems and the specific type of mold."). Thus, in order for Plaintiffs to establish specific causation, they bear the burden of proving, by a preponderance of evidence, that the specific type of mold found in the residence caused their injuries.

The court in *Jenkins* was faced with a similar *Daubert* motion to the one before this Court. There, plaintiffs' expert opined that the plaintiffs' symptoms were consistent with mold exposure and that because such symptoms started or were exacerbated during the time plaintiffs lived in the apartment at issue, their symptoms and illnesses must have been caused by mold exposure. *Jenkins*, 2008 WL 2649510, at *6. Moreover, the plaintiffs in *Jenkins*, underwent skin testing/scratch tests, and neither showed sensitivity or allergy to Aspergillus at any point. *Id.* at *6, fn. 8. The court determined that the plaintiffs' expert opinion was merely supported by "a causal relationship based merely upon a temporal relationship between alleged exposure and the occurrence of symptoms." *Id.* at *6. The court granted the defendants' motion

*in limine* to exclude the medical doctor's testimony as to medical or specific causation. *Id.*

Applying the reasoning in *Jenkins* to the Dr. Ghosh's proposed testimony, it is evident that Dr. Ghosh must be precluded from testifying as to medical or specific causation. The first major flaw in Dr. Ghoush's expert opinion is that he has no evidence that Plaintiffs were exposed to mold while they lived in the home in question. Assuming that some unsafe level of mold existed, Dr. Ghosh is unable to prove that the mold in the home rose to that level and caused Plaintiffs injuries. Further, Dr. Ghosh's opinion relies on hypotheticals which he perceives as facts. Specifically, Dr. Ghosh relies heavily on the conclusion of Dr. Leumas' report, which he admits is speculation. (Rec. Doc. 62-10, at 29) Dr. Ghosh also relied on Dr. LaCour's report in determining that mold caused all of the symptoms in Sarah Hooks, the two minor children, and Mr. Kronlage. But Dr. LaCour's report did not mention mold in the diagnosis section of Sarah Hooks or the two minor children. Thus, similar to the expert in *Jenkins*, it appears that the Dr. Ghosh associates the "causal relationship based merely upon a temporal relationship between alleged exposure and the occurrence of symptoms." *Jenkins*, 2008 WL 2649510, at *6. Therefore, the Court

finds that Dr. Ghosh's testimony is unreliable and he may not testify to specific causation.[5]

### d. Steve Verret

Steve Verret is a Certified Industrial Hygienist who conducted a mold analysis at the Hooks residence via "tape lift" on October 22, 2014. (Rec. Doc. 66, at 6.) Defendants first argue that Plaintiffs did not identify Mr. Verret as an expert in this case and that he has not produced a curriculum vitae. (Rec. Doc. 59-1, at 10.) Attacking Mr. Verret's tape lift report, Defendants argue that "Mr. Verret also fails to provide any expert qualifications to offer such opinions, fails to provide any scientific basis for such opinions, and fails to provide any data concerning whether or in what airborne quantities plaintiffs were actually exposed to these spores." *Id.* Defendants ultimately allege that Mr. Verret's report fails to assist plaintiffs in establishing general causation in this case. *Id.* Plaintiffs argue that Mr. Verret is permitted to testify about his observations at the Hooks residence as a fact witness and authenticate records as necessary. (Rec. Doc. 66, at 15.)

---

[5] The Court also questions Dr. Ghosh's qualifications to provide an opinion as to specific causation without being permitted to render a medical diagnosis. However, regardless of whether Dr. Ghosh is qualified, the Court finds that Dr. Ghosh's testimony as to specific causation is unreliable and should be excluded.

Glenn Ray compared his report findings to Mr. Verret's to reach his ultimate conclusion. Plaintiff intends to use Mr. Verret only to "authenticate documents that Mr. Ray refers to in his report, or to testify about his actual observations at the Hooks residence as a fact witness." *Id.* at 6, 15. Plaintiffs have not produced an expert report of Mr. Verret, as defined by Rule 26(a)(2)(B). Therefore, Mr. Verret is not permitted to testify as an expert in this case and his testimony is limited to verifying documents and observations he witnessed while in the Hooks' home.

**III.    Defendants' Motion for Summary Judgment**

      **a.    Summary Judgment Standard**

Summary judgment is appropriate when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (citing Fed. R. Civ. P. 56(c)); *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994). When assessing whether a dispute as to any material fact exists, the Court considers "all of the evidence in the record but refrains from making credibility determinations or weighing the evidence." *Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co.*, 530 F.3d 395, 398 (5th Cir. 2008). All reasonable inferences are drawn in favor of the nonmoving party,

but a party cannot defeat summary judgment with conclusory allegations or unsubstantiated assertions. *Little*, 37 F.3d at 1075. A court ultimately must be satisfied that "a reasonable jury could not return a verdict for the nonmoving party." *Delta*, 530 F.3d at 399.

If the dispositive issue is one on which the moving party will bear the burden of proof at trial, the moving party "must come forward with evidence which would 'entitle it to a directed verdict if the evidence went uncontroverted at trial.'" *Int'l Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1263-64 (5th Cir. 1991) (citation omitted). The nonmoving party can then defeat the motion by either countering with sufficient evidence of its own, or "showing that the moving party's evidence is so sheer that it may not persuade the reasonable fact-finder to return a verdict in favor of the moving party." *Id*. at 1265.

If the dispositive issue is one on which the nonmoving party will bear the burden of proof at trial, the moving party must "'demonstrate the absence of a genuine issue of material fact,' but need not *negate* the elements of the nonmovant's case." *Little*, 37 F.3d at 1075 (quoting *Celotex*, 477 U.S. at 323). "If the moving party fails to meet this initial burden, the motion must be denied, regardless of the nonmovant's response. If the movant does, however, meet this burden, the nonmovant must go beyond the pleadings and designate specific facts showing that there is a

genuine issue for trial." *Id.* The nonmovant's burden "is not satisfied with 'some metaphysical doubt as to the material facts,' by 'conclusory allegations,' by 'unsubstantiated assertions,' or by only a 'scintilla' of evidence." *Id.* (citations omitted).

### b.   Parties' Arguments

Defendants move for summary judgment in their favor on the grounds that there are no genuine issues of material fact and Plaintiffs cannot satisfy their burden of proof at trial on causation. First, Defendants contend that Plaintiffs cannot prove the presence of, or exposure to, any harmful molds. (Rec. Doc. 62-2, at 4.) Second, Defendants argue that Plaintiffs cannot produce evidence sufficient to satisfy their burden of proof at trial on the issue of general causation. *Id.* at 5. And third, Defendants contend that Plaintiffs cannot produce evidence sufficient to satisfy their burden of proof at trial on the issue of specific causation. *Id.* at 16. Defendants assert that Plaintiffs have failed to produce any mold tests that were taken while they were living in their home. *Id.* at 6. Defendants argue that the report of Plaintiffs' expert, Glenn Ray, is inadequate to establish general causation. *Id.* at 5. According to Defendants, the data collected in Ray's report is not representative of the levels of mold concentration when Plaintiffs lived in the home and tells nothing of the potential mold levels that Plaintiffs may have actually

36

been exposed. (Rec. Doc. 62-2, at 10.) Similarly, Defendants argue
that the report of Plaintiff's expert, Dr. Ghosh, is inadequate to
establish general or specific causation. *Id.* at 11. Moreover,
Defendants argue that two of Plaintiffs' physicians, Dr. Leumas
and Dr. LaCour, fail to provide any information concerning the
concentration or dose of any species of mold necessary to produce
symptoms similar to those that Plaintiffs allege. *Id.* at 19, 22.
In this regard, Defendants argue that Plaintiffs have failed to
produce any medical testimony linking any exposure to the actual
ailments that they allege. *Id.* at 16. Defendants argue that Dr.
Leumas admitted that he is not an expert on mold but postulated
that it was "believable" that mold "could be" the cause of the
children's respiratory problems. *Id.* at 19. Similarly, Defendants
argue that Dr. LaCour's opinion is that Kronlage's condition is
"usually caused" by certain types of molds, but he does not state
with any degree of certainty that mold exposure actually caused
Kronlage's symptoms. (Rec. Doc. 62-2, at 22.) Moreover, Defendants
argue that Plaintiffs' evidence supports nothing more than a
temporality argument. *Id.* According to Defendants, however, the
children's alleged health problems predated the discovery of mold
in the home in 2014 and Kronlage's respiratory problems even
predated the Hooks's purchase of the home in 2010. *Id.*

In opposition, Plaintiffs contend that they can present admissible evidence to prove all material aspects of causation. (Rec. Doc. 68, at 18.) Plaintiffs intend to call Mr. Ray to testify about the potential health effects of mold, specifically Aspergillus and Penicillium, which were found at elevated levels within the residence. *Id.* Plaintiffs intend to call Dr. Ghosh to testify to the specific role of mold in causing or exacerbating "the symptoms and disease process of the Hooks family." *Id.* Plaintiffs claim that the treating physicians will positively identify mold as both a source and exacerbating element of Plaintiffs' illnesses. *Id.* To the extent Defendants' medical experts disagree with Plaintiffs' experts, Plaintiffs argue that those disagreements create genuine issues of material fact which must be resolved at trial. *Id.* at 2. In addition, Plaintiffs argue that there is a presumption that their illnesses resulted from mold exposure because of the temporal proximity between their symptoms and the exposure. (Rec. Doc. 68, at 1.) Finally, Plaintiffs argue that they entitled to a *Housley* presumption. *Id.*

### c.  Discussion

In the instant case, Plaintiffs' claims for personal injuries stem from their alleged exposure to toxic mold. The parties do not dispute that Louisiana's duty-risk analysis governs Plaintiffs'

claims.[6] Under this analysis, a plaintiff must prove five separate elements: "(1) the defendant had a duty to conform his or her conduct to a specific standard of care; (2) the defendant failed to conform his or her conduct to the appropriate standard of care; (3) the defendant's substandard conduct was a cause-in-fact of the plaintiff's injuries; (4) the defendant's substandard conduct was a legal cause of the plaintiff's injuries; and (5) actual damages." *S.J. v. Lafayette Par. Sch. Bd.*, 41 So. 3d 1119, 1125 (La. 2010). If the plaintiff fails to prove any one element by a preponderance of the evidence, the defendant is not liable. *Perkins v. Entergy Corp.*, 782 So. 2d 606, 611 (La. 2001).

Defendants contend that Plaintiffs fail to satisfy the causation elements of the duty-risk analysis. Causation has been characterized as "the Achilles heel of a mold claim." *Watters*, 15 So. 3d at 1142. In a toxic mold case, plaintiffs must establish causation on five different levels: "(i) the presence of mold, (ii) the cause of the mold and the relationship of that cause to a specific defendant, (iii) actual exposure to the mold, (iv) the exposure was a dose sufficient to cause health effects (general causation), and (v) a sufficient causative link between the alleged health problems and the specific type of mold found (specific causation)." *Id.* at 1142-43.

---

[6] Plaintiffs dispute the applicability of the Louisiana Products Liability Act ("LPLA") to their claims against Oak Creek; however, this distinction is immaterial for purposes of Defendants' instant motion.

Defendants' motion for summary judgment focuses on general causation and specific causation. In a toxic tort case, the plaintiff must present admissible expert testimony to establish general causation as well as specific causation. *See Allen v. Pa. Eng'g Corp.*, 102 F.3d 194, 199 (5th Cir. 1996) ("Scientific knowledge of the harmful level of exposure to a chemical, plus knowledge that the plaintiff was exposed to such quantities, are minimal facts necessary to sustain the plaintiffs' burden in a toxic tort case."). "Evidence concerning specific causation in toxic tort cases is admissible only as a follow-up to admissible general causation evidence." *Knight*, 482 F.3d at 351.

"General causation is whether a substance is capable of causing a particular injury or condition in the general population." *Id.* In a toxic mold case, a plaintiff must establish that a level of exposure to the type of mold in question can cause adverse health effects in general. *See Watters*, 15 So. 3d at 1143 n.18 ("General causation refers to proving exposure in a dose sufficient to cause health effects—that exposure to mold can cause disease."). Thus, in order for Plaintiffs to establish general causation, they bear the burden of proving, by a preponderance of evidence, that they were exposed to a level of mold sufficient to cause health effects.

"[S]pecific causation is whether a substance caused a particular individual's injury." *Knight*, 482 F.3d at 351. "Evidence concerning specific causation in toxic tort cases is admissible only as a follow-up to admissible general causation evidence." *Id.* In a toxic mold case, a plaintiff must prove, given that the mold in question is capable of causing harm of the type suffered, that the specific type of mold found more likely than not caused the plaintiff's injuries in this particular case. *See Watters*, 15 So. 3d at 1143 n.18 ("Specific causation refers to proving a sufficient causative link between the alleged health problems and the specific type of mold."). Thus, in order for Plaintiffs to establish specific causation, they bear the burden of proving, by a preponderance of evidence, that the specific type of mold found in the residence caused their injuries.

As explained above, the Court has already determined that Glenn Ray, Dr. Ghosh, and Steve Verret may not and cannot provide an opinion as to either general or specific causation in this case. *Supra.* Sec. II (b)-(d). Further, the Court has determined that the testimony of Dr. Sweta Shah and Dr. Verangue must be excluded in this case due to Plaintiffs failure to file an expert report in compliance with Rule 26 of the Federal Rules of Civil Procedure. *Supra.* Sec. I (c). Therefore, the only remaining inquiry is whether Plaintiffs' experts Dr. Leumas and Dr. LaCour can provide testimony

as to general and specific causation. The Court will address each in turn.

Plaintiffs also rely on the reports and testimony of their treating physicians, Dr. Leumas and Dr. LaCour, to establish causation. In particular, Plaintiffs rely on a letter from Dr. Leumas providing a medical opinion on Sarah's minor children, C.H. and LH. (Rec. Doc. 62-11, at 1.) Dr. Leumas explains that the degree and extent of the children's course of respiratory-tract related illnesses over the past several years is "seldom seen . . . even for the highly allergic child." *Id.* According to Dr. Leumas, L.H. had an allergy blood profile done in March 2014, which showed no disposition for fifteen common foods and inhalants that might have explained the frequency of her symptoms. *Id.* With all fifteen results being negative, Dr. Leumas states that "the likelihood that environmental exposure to air-borne toxins and respiratory irritants (not to be confused with allergens and allergies) could be the culprits would not only be believable, but also, in my opinion, be more likely than not to be at least partially and directly responsible for both the severity and frequency of the respiratory exposure." *Id.* Dr. Leumas mentions the word "partially" because the children's mother was still smoking during the period of exposure. *Id.*

Based on a review of the children's records and the results of L.H.'s allergy blood profile, Dr. Leumas provided the following opinion relevant to specific causation:

> *I am not an expert on toxic mold*, but I do know that many of the normal molds found in our environment, with daily excessive exposure, may act [as] allergens, irritants, and toxins to the lungs. I do believe that if their home provided the environment required for the excessive propagation of molds where these children lived with this daily excessive exposure, this would explain why they became and stayed chronically ill while living there, especially if their symptoms diminished dramatically after they moved out.

(Rec. Doc. 62-11, at 1) (emphasis added).

Dr. Leumas's opinion fails to pass muster under *Daubert*. First, by his own admission, he is not an expert on toxic mold. Thus, he is unable to establish a direct nexus between the levels of exposure to mold and any subsequent illness that overcame the Plaintiffs. Second, Dr. Leumas did not perform a proper differential diagnosis on LH or CH. Differential diagnosis is "a process of elimination by which medical practitioners determine the most likely cause of a set of signs or symptoms from a set of possible causes." *Pick v. Am. Med. Sys., Inc.*, 198 F.3d 241 (5th Cir. 1999).[7] A reliable differential diagnosis must rule in the

---

[7] Most circuits have held that a reliable differential diagnosis satisfies *Daubert* and provides a valid foundation for admitting an expert opinion. The Fifth Circuit, however, "has not written on the question of whether an expert opinion based on differential diagnosis can meet the *Daubert* standard." *Pick*, 198 F.3d 241. In *Pick v. American Medical Systems, Inc.*, the court opted not to make such a ruling, and instead assumed that even if the process of differential diagnosis can provide sufficient scientific reliability, the doctor in that case did not base his opinion regarding the cause of the plaintiff's illness on differential diagnosis.

suspected cause of an injury and rule out other causes or determine which of the remaining explanations is most likely the cause. *See Westberry v. Gislaved Gummi AB*, 178 F.3d 257, 262 (4th Cir. 1999). Although Dr. Leumas does not state in his letter that he employed a differential diagnosis methodology to arrive at his conclusion, it appears that his conclusion was based, at least in part, on the fact that he ruled out fifteen potential causes of L.H.'s symptoms.

Dr. Leumas's methodology, however, is scientifically unreliable. Specifically, Dr. Leumas's report does not conclude that LH's or CH's symptoms were even caused by the molds found in the home, Aspergillus and Penicillium. Further, the record does not reflect that any of the Plaintiffs underwent any testing to determine allergies to Aspergillus, Penicillium, or any other types of mold. *See Roche v. Lincoln Prop. Co.*, 278 F. Supp. 2d 744, 751 (E.D. Va. 2003) (finding doctor's opinion that mold was the cause of an illness unreliable because the plaintiff was not allergic to the molds found in his apartment); *Flores v. Allstate Tex. Lloyd's Co.*, 229 F. Supp. 2d 697, 702 (S.D. Tex. 2002) (finding doctor's testimony inadmissible in part because the doctor had not based "his testimony on the results of any testing done to determine whether Plaintiffs [were] allergic to any specific type of mold found in their home"). In addition, Dr. Leumas does not state whether CH had an allergy blood profile done;

therefore, there is no evidence that Dr. Leumas ruled out other allergens that could potentially cause CH's symptoms.

Third, Dr. Leumas offers no basis for linking the specific levels of mold found in the home to the Plaintiffs' symptomology. In his letter, Dr. Leumas does not state what specific type of mold more likely than not caused any particular symptom in C.H. or L.H., nor was any dosage evaluation made of their exposure to mold in the home. *See Flores*, 229 F. Supp. 2d at 702, n.9 (noting that in the Fifth Circuit, "in cases involving exposure to chemical or biological agents, it is necessary under *Daubert* to show that the claimant received an exposure sufficient to cause a response"). Because he had no accurate information on the level of Plaintiffs' exposure to a specific type of mold found in the home, Dr. Leumas necessarily had no support for the theory that the mold in the home to which Plaintiffs were exposed caused their illnesses. *See Moore*, 151 F.3d at 278 (finding doctor's testimony unreliable because he had no information about the level of plaintiff's exposure to the chemical solution and thus could not adequately support an assertion that the levels plaintiff was exposed to were sufficient to cause adverse health effects). Dr. Leumas merely expresses a hypothetical opinion that exposure to "many of the normal molds" would explain why the children became ill if the home provided the environment required for the "excessive propagation of molds," the children lived with "daily excessive

45

exposure," and their symptoms diminished dramatically after they moved out.

Dr. LaCour's medical reports are also insufficient to establish specific causation. Dr. LaCour completed a "Physician's Opinion Report" after treating C.H., L.H., and Kronlage. (Rec. Doc. 42-6, at 8-10.) None of Dr. LaCour's reports provide an opinion that any of the Plaintiffs' symptoms was caused by exposure to a specific type of mold found in the home.[8] Therefore, Dr. LaCour's reports simply fail to assist Plaintiffs in meeting their burden of proving a sufficient causative link between their health problems and the specific types of mold found in the home.

Lastly, Plaintiffs rely heavily on a theory of causation based on the temporal relationship between the alleged exposure and occurrence of symptoms, citing *Housley v. Cerise*, 579 So.2d 973 (La. 1991). (Rec. Doc. 68, at 17.) Under Louisiana law, "[a] claimant's disability is presumed to have resulted from an accident, if before the accident the injured person was in good health, but commencing with the accident the symptoms of the disabling condition appear and continuously manifest themselves afterwards," provided that "medical evidence shows there to be a reasonable possibility of causal connection between the accident

---

[8] Dr. LaCour diagnosed Kronlage with allergic fungal sinusitis, which is "usually due to" certain types of mold, including Aspergillus. (Rec. Doc. 42-6, at 10.) But Dr. LaCour does not state with any degree of medical certainty that exposure to Aspergillus in the home caused Kronlage's symptoms.

and the disabling condition." *Id.* at 980 (quoting *Lucas v. Ins. Co. of N. Am.*, 342 So. 2d 591, 596 (La. 1977)). Before *Housley*, this presumption of causation had only been applied in workers' compensation cases. Nevertheless, in *Housley* the Louisiana Supreme Court applied the presumption to aid a plaintiff in an ordinary negligence case.

To benefit from the *Housley* presumption, a plaintiff must (1) prove that he was in good health prior to the accident at issue; (2) show that subsequent to the accident, symptoms of the alleged injury appeared and continuously manifested themselves afterwards; and (3) "demonstrate through evidence—medical, circumstantial, or common knowledge—a reasonable possibility of causation between the accident and the claimed injury." *Juneau v. Strawmyer*, 647 So. 2d 1294, 1299 (La. App. 4 Cir. 1994). Louisiana courts have applied the presumption in toxic mold cases. For example, in *Reddoch v. Par. of Plaquemines*, the court applied the *Housley* presumption to aid plaintiffs in a case alleging damages for mold exposure and health problems suffered therefrom while working in the parish emergency services center between 1998 and 2002. 134 So. 3d 683, 690 (La. App. 4 Cir. 2014).[9]

---

[9] In *Reddoch*, eighteen plaintiffs testified about the mold in the building, its smell, and the health problems they suffered as a result of the mold. The presence of the mold in the building was undisputed. In further support, the parties stipulated to and entered into evidence an expert report that confirmed the presence of seven kinds of fungal organisms in the building and described the symptoms the seven types of fungal organisms can cause. The court held that the plaintiffs' testimony coupled with the report were sufficient sources of

Here, Plaintiffs are not aided by the *Housley* presumption. First, an opinion on causation based primarily on temporal proximity between exposure and illness does not meet *Daubert* standards. *See Moore*, 151 F.3d at 278 ("In the absence of an established scientific connection between exposure and illness, or compelling circumstances[10] . . . the temporal connection between exposure to chemicals and an onset of symptoms, standing alone, is entitled to little weight in determining causation."); *Hooper v. Travelers Ins. Co.*, 74 So. 3d 1202, 1205 (La. App. 4 Cir. 2011) (trial court did not abuse its discretion in excluding doctor's testimony based on temporal proximity theory because doctor's opinions were formed without any knowledge of the types of mold to which plaintiff had been exposed or the level of exposure).

Second, Plaintiffs have failed to establish that they were in good health prior to the alleged exposure. Plaintiffs' symptoms predate evidence of any mold in their home. As discussed above, samples showing the presence of mold in the home were taken in

---

direct and circumstantial evidence that the mold caused their symptoms. 134 So. 3d at 690.

[10] In describing "compelling circumstances," the Fifth Circuit referred to *Cavallo v. Star Enter.*, 892 F. Supp. 756 (E.D. Va. 1995). In *Cavallo*, the plaintiff alleged that she suffered respiratory illness as a result of exposure to jet fuel vapors. The court rejected her expert's reliance on the temporal proximity between exposure and symptoms. Although, "there may be instances where the temporal connection between exposure to a given chemical and subsequent injury is so compelling as to dispense with the need for reliance on standard methods of toxicology," this was not such a case. *Id*. at 774. The court pointed out that the plaintiff was not "doused with" jet fuel and there was no substantial number of others who were exposed to jet fuel vapors and experiencing similar effects.

October and December 2014, and Sarah Hooks testified that she saw mold in the home around June or July 2014. Plaintiffs' medical records, however, indicate that their symptoms began as early as 2010 and 2011.[11] (Rec. Doc. 42-6, at 8-10.) Thus, Plaintiffs' temporality argument fails.

Based on the foregoing, the Court finds that Plaintiffs have failed to make a showing sufficient to establish general or specific causation, both requisite elements to their toxic mold claims and ones which they must prove by a preponderance of the evidence. In conclusion, the Court finds that summary judgment is appropriate, as Plaintiffs have failed to establish general and specific causation as to their toxic tort claims involving mold.

---

[11] Dr. LaCour identified the "date of injury" for LH as November 1, 2011, and the "date of injury" for CH as December 30, 2010. (Rec. Doc. 66-3, at 1.) Similarly, Kronlage testified that he began experiencing symptoms in June 2010. (Rec. Doc. 62-18.)

## CONCLUSION

Accordingly,

**IT IS HEREBY ORDERED** that Defendants' *Motion for Summary Judgment* **(Rec. Doc. 62)** is **GRANTED**. The claims of Michael Kronlage and Sarah Hooks on behalf of her minor children C.H. and L.H., against Nationwide Housing Systems, LLC and Oak Creek Home, LLC, for personal injuries allegedly suffered as a result of exposure to mold in the subject home are **DISMISSED**.


New Orleans, Louisiana, this 11th day of July, 2016.


_____
CARL J. BARBIER
UNITED STATES DISTRICT JUDGE